**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 29, 2012**

# In the Court of Appeals of Georgia

A12A1622. HARGIS v. THE STATE.

BRANCH, Judge.

On appeal from his conviction for attempt to manufacture methamphetamine, possession of ephedrine and pseudoephedrine, and other crimes, Anthony Hargis argues that the trial court erred when it denied his motion to suppress evidence seized pursuant to his July 2009 arrest after he failed to appear at trial originally scheduled for February 2009 and when it did not recuse itself after receiving an ex parte communication before trial from a co-defendant's counsel about Hargis's alleged propensity for violence. Because the trial court erred when it failed to recuse itself from the case after receiving the ex parte communication, we reverse Hargis's conviction and order a new trial. Taking up the matter because it is likely to recur on

retrial,[1] we also conclude that the trial court erred when it denied Hargis's motion to suppress the evidence seized in July 2009.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of innocence." (Citation omitted.) *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004). We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979).

So viewed, the record shows that in June 2006, after reviewing records concerning Hargis's transactions on Ebay between September 2003 and March 2006, including the purchase of a number of items used in methamphetamine manufacture, a drug enforcement agent obtained a warrant to search the house where Hargis lived with co-defendant Karen Taylor. The agent found Hargis working in an outbuilding

---

[1] Hargis also contends that the trial court erred when it conducted voir dire outside the presence of Hargis or his counsel, when it took judicial notice of his failure to appear for the February 2009 trial, when it failed to merge certain counts at sentencing. and when it held that trial counsel was not ineffective. These contentions are mooted by our grant of a new trial.

outfitted with equipment used in methamphetamine manufacture, a ventilation shaft, and a surveillance camera. Taylor arrived during the search, and both were arrested. An agent recovered a handgun from a bedroom in the house. Other evidence seized included shipping labels addressed to Hargis, a box of false identification cards with his picture on each card, over-the-counter tablets containing ephedrine and pseudoephedrine, and liquids that tested positive for the two substances. Agents also found written directions to a number of pharmacies in Taylor's handwriting. In September 2006, Hargis was charged with attempt and conspiracy to manufacture methamphetamine, possession of ephedrine and pseudoephedrine, possession of false identification, and second-degree forgery.

When Hargis did not appear at a scheduled trial in February 2009, a bench warrant was issued for his arrest. After receiving an anonymous tip in July 2009 that Hargis was at his house, officers went to the house one afternoon and saw a beige truck matching the neighbors' description of Hargis's vehicle appear in the driveway and then speed away. An officer soon saw the truck parked at a convenience store, unoccupied but with its headlights on. When the officer saw a man walk up and get into the driver's seat of the truck, he pulled up to the truck and activated his blue lights. The officer told the man that a BOLO had issued on the truck and that its owner

3

was wanted on an arrest warrant. The officer then asked the man for his driver's license. When the man fumbled with his wallet, the officer saw two forms of identification inside it. When the man said that he did not have a license and did not have to give his name, the officer asked him to step out of the truck. When the man did so, the officer began to handcuff him "for [the officer's] safety" and until the officer "could identify who [Hargis] actually was." Hargis resisted and cursed the officer, but other officers arriving on the scene helped to subdue him.

With Hargis now under arrest for obstruction, the officer picked up Hargis's wallet (which he had left on the driver's seat of the truck), opened it, and saw two identification cards with the same picture but different names. After the first officer gave a second officer one of the false IDs, the second officer looked into the truck and saw two drugstore bags lying in the passenger's side front seat. The second officer opened the truck door, retrieved and opened the bags, and found items containing ephedrine, lighter fluid, brake cleaner, and 17 identification cards bearing Hargis's photograph.

Based on the evidence obtained from Hargis's truck, officers obtained a search warrant for Hargis's house and found boxes containing devices for manufacturing and smoking methamphetamine, one of which contained the drug. A tape recorder and

4

cassette tape were also seized. Conversations on the tape included Hargis instructing Taylor on the use of the recorder, Taylor's conversations with her counsel, and their negotiations with prosecutors assigned to the case.

One month later, at a pretrial hearing[2] on the 2006 charges including attempt and conspiracy to manufacture methamphetamine, the trial court ruled that evidence of the events incident to Hargis's July 2009 arrest were admissible as a similar transaction. Later in the same hearing, Hargis moved to suppress the evidence seized in July 2009 as the product of an illegal search. The trial court denied the motion.

On the first day of Hargis's trial on the 2006 charges, held in late September and early October 2009, and in addition to the evidence directly supporting those charges, the State moved to admit evidence of Hargis's failure to appear at the February 2009 trial as indicating consciousness of guilt as well as the tape seized in July 2009 for the purpose of showing the existence of a conspiracy between Taylor and Hargis. The court ruled the tape admissible for the limited purpose of showing the existence of a conspiracy. After a jury found Hargis guilty on all counts, the State introduced evidence for sentencing purposes of two 1997 felony convictions from Arizona, including one for attempted possession of methamphetamine manufacturing

---

[2] See Uniform Superior Court Rule 31.3 (B).

5

equipment. Hargis was convicted and sentenced as a recidivist to two consecutive life terms plus 20 years.

On June 3, 2011, Hargis's appellate counsel[3] filed an amended motion for new trial arguing, inter alia, that the trial court erred when it sentenced Hargis[4] and when it failed to recuse itself after receiving an ex parte communication from Taylor's counsel. During the hearing on the motion, held the same day, the prosecutor testified that at some point before trial, Taylor's counsel had entered chambers and, outside the presence of Hargis's counsel, had talked to the judge about the tape discovered in the

---

[3] Before her case was severed from Hargis's, Taylor was represented by a colleague of Hargis's trial counsel. After Hargis was convicted, he refused to waive a potential conflict arising from these representations. As a result, the trial court replaced Hargis's trial counsel with appellate counsel.

[4] At the outset of the hearing on the motion, the State conceded that because Hargis's 1997 Arizona convictions could not be used in aggravation of his sentence, the maximum sentence for Hargis's conviction for either conspiracy or attempt to manufacture methamphetamine was 30 years rather than life imprisonment. See OCGA § 16-13-30 (d) (on conviction for "a second or subsequent offense" of possession or manufacture of certain controlled substances, a defendant "shall be imprisoned for not less than ten years nor more than 40 years or life imprisonment"; the provisions of "subsection (a) of" the recidivist statute, OCGA § 17-10-7, concerning out-of-state felony convictions, "shall not apply to a sentence imposed for a second such offense, provided, however, that the remaining provisions" of the same statute "shall apply for any subsequent offense").

6

July 2009 search.[5] Hargis's trial counsel testified that at the time of this communication between Taylor's counsel and the judge, he knew that Taylor's counsel had met with the judge on the subject of the tape but did not know that Taylor's counsel had expressed "concerns" about Hargis until after trial. Hargis's trial counsel did not object or move to recuse the judge on the basis of this meeting. Under examination by Hargis's appellate counsel, Taylor's counsel confirmed that she had spoken to the judge outside the presence of either Hargis or his trial counsel about her "concerns," including "personal safety issues and things of that nature." The testimony continues:

Q. And when you say "concerned about safety issues," what do you mean?

A. I considered Mr. Hargis to be somewhat – I've always been very leery about Mr. Hargis, danger kind of things, you know, just always somebody that I would probably watch my back with.

Q. And that was something you communicated to the judge, is that correct?

A. Can't recall the specifics of the conversation, but I do recall that being a concern. . . . I just remember being concerned about the contents of the tape, what I might have said on the tape, what Ms. Taylor might have said on the tape, what Mr. Hargis might have

---

[5] There was doubt as to whether the prosecutor was present for the communication.

7

> heard on the tape and, you know, if that were to be played in open court or if Mr. Hargis were to hear it or something like that, there were some personal safety issues that I was concerned about.
>
> Q. And just to specify, when you say you were concerned about it, was that concern something you voiced with the judge? . . .
>
> A. I believe I did. I can't quote that a hundred percent, but I believe I did.

The State concedes that neither Hargis nor his trial counsel were present for this ex parte communication, and there is no evidence that Hargis learned of its contents before or during trial.

Eight months after the hearing on the amended motion, the trial court denied the remainder of Hargis's motion for new trial. Neither at the hearing on the motion nor in its order denying it did the trial court dispute any part of Taylor's counsel's account of the ex parte communication.

1. As a preliminary matter, we note that although Hargis asserts that the trial court erred when it denied his motion to suppress the evidence seized from his truck and house during the July 2009 search, he does not dispute the sufficiency of the remaining evidence against him. Reserving the merits of Hargis's motion to suppress for Division 3 below, we conclude that the evidence seized during the 2006 search of Hargis's residence was sufficient to sustain his conviction for the charges against him,

8

all of which date from 2006. See OCGA §§ 16-13-33 (defining attempt to violate the controlled substances laws, punishable by "imprisonment not exceeding the maximum punishment prescribed for the offense"); 16-13-30.3 (b) (1) (defining possession of ephedrine and pseudoephedrine); 16-9-4 (b) (1) (defining possession of false identification); 16-9-1 (c) (defining forgery in the second degree); *Jackson*, supra.

2. On appeal, as below, Hargis argues that the trial court erred when it failed to recuse itself in the wake of receiving the ex parte communication from Taylor's counsel.

Section (B) (7) of Canon 3 of the Georgia Code of Judicial Conduct forbids a judge from considering an ex parte communication:

> Judges shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. *Judges shall not initiate or consider ex parte communications, or consider other communications made to them outside the presence of the parties concerning a pending or impending proceeding*, [excepting communications for administrative purposes, emergencies, consultations with experts or court personnel, and settlement conferences].

(Emphasis supplied.) See also Uniform Superior Court Rule 4.1 ("judges shall neither initiate nor consider ex parte communications by interested parties or their attorneys concerning a pending or impending proceeding."). It is also clear that ex parte

9

communications "are presumed to have been in error." *City of Pendergrass v. Skelton*, 278 Ga. App. 37, 39 (1) (628 SE2d 136) (2006); see also *In the Interest of D.D.*, 310 Ga. App. 329, 332 (2) (713 SE2d 440) (2011). Once a party has shown that a judge has received an ex parte communication, therefore, the resulting presumption of harm can be overcome only by an affirmative showing that the judge did not consider the communication. See *Arnau v. Arnau*, 207 Ga. App. 696, 696-697 (1) (429 SE2d 116) (1993) (judge who acknowledged ex parte meeting with a witness did not provide evidence sufficient to overcome presumption that the communication was error); compare *In the Interest of Martin*, 218 Ga. App. 79, 80 (1) (460 SE2d 304) (1995) (ex parte letter sent to judge by witness was not harmful error when party asserting error did not argue that the judge responded in any manner or gave the letter any consideration). We thus examine in greater detail (a) whether Hargis's failure to object or to move for the judge's recusal after learning of the communication amounted to a waiver of his claim of error concerning it, and (b) whether the State can rebut a presumption of harm.

(a) First, Hargis did not waive his objection to the ex parte communication. Canon 3 (E) (1) sets out the general provision that "[j]udges should disqualify themselves in any proceeding in which their impartiality might reasonably be

10

questioned," including cases in which the judge "has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding"; has served as or associated with a lawyer or served as a witness "in the matter of controversy"; or has personal connections to the case (subsections (c), (d), and (e)). Georgia Code of Judicial Conduct, Canon 3 (E) (1) (a) – (e). The waiver provision of Canon 3 is set out in subsection (F), which provides that "[j]udges disqualified by the terms of Section 3 (E)" – that is, the general provision – "may disclose on the record the basis of their disqualification and may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification." Code of Judicial Conduct, Canon 3 (E), (F).

On its face, then, Canon 3 (F)'s waiver provision cannot be applied to the ex parte communications covered by the more specific prohibitions of Canon 3 (B) (7). As the Supreme Court of Georgia has held, moreover, in situations involving "specific disqualification standards," the Canon is "meant to be self-enforcing, and it is the trial court's duty to disqualify himself as soon as he is aware that the grounds exist." (Citation and punctuation omitted.) *Pope v. State*, 257 Ga. 32, 34 (2) (a) (354 SE2d 429) (1987) (citing the 1984 version of Canon 3 as well as 28 U.S.C. § 455 (e), which provides that "[n]o justice, judge, or magistrate . . . shall accept from the parties to the

11

proceeding a waiver of any ground for disqualification enumerated in subsection (b)[,]" including cases in which the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding"). Thus "[n]o waiver of disqualification under one of the specific disqualifications standards," which now includes subsection 3 (B) (7)'s standard governing ex parte communications, "is possible" unless authorized by the Canon itself. (Citation omitted.) Id. at 34 (2) (a) and n. 1 (noting 1984 Canon's "waiver provision with respect to two of the specific disqualification grounds"); see also *Mayor &c. of Savannah v. Batson-Cook Co.*, 291 Ga. 114, 119 (1) (728 SE2d 189) (2012) (an appellate court reviews a trial court's ruling on a motion to recuse under Canon 3 (E) de novo rather than for an abuse of discretion).

As we have suggested above, there is no dispute that before being relieved of his duties, trial counsel for Hargis had no notice of the contents of the ex parte communication between Taylor's counsel and the trial court; that the communication asserted that Hargis might react with violence to the knowledge that Taylor had met with prosecutors and taped her conversations with them and with him; and that appellate counsel for Hargis raised the matter of the ex parte communication in the amended motion for new trial and proffered undisputed evidence as to its contents at the hearing on that motion. Pretermitting whether trial counsel should have

12

investigated further or objected sooner, appellate counsel raised the matter of the ex parte communication at the hearing on Hargis's amended motion for new trial before the judge who received the communication, who never affirmatively stated that she did not consider it, and who was thus presiding over the issue of her own qualifications to rule on the motion for new trial after the matter had been raised. Because Canon 3 does not authorize a waiver when the issue of an ex parte communication is thus raised in the trial court, Hargis's failure to move to recuse cannot amount to a waiver of his claim that the trial court should have recused itself. See *In the Interest of D. D.*, 310 Ga. App. 329, 331 (2) (713 SE2d 440) (2011) (remanding for further proceedings concerning judge's ex parte communication with a school official, including determinations as to whether issue was waived because raised for the first time in the appellate court); compare *Ga. Power Co. v. Ga. Pub. Serv. Comm.*, 196 Ga. App. 572-573 (1) (396 SE2d 562) (1990) (complaint of ex parte communication had been waived on appeal when the issue was raised by a different party below).

(c) Nor can the State show that the trial court's error in receiving the ex parte communication was harmless.

In *Arnau*, supra, this Court ordered a new trial when an ex parte communication between a court-appointed psychologist and the trial court had deprived a party of "the opportunity to cross-examine the witness with respect to any opinions he offered" during the ex parte communication "or to respond to any new allegations or other evidence which may have been presented to the court." (Citation omitted.) 207 Ga. App. at 696-697 (1). Because there was "no transcript of the ex parte meeting included in the record," the party opposing the motion for new trial could not prove that the information was cumulative. Id. at 697 (1). Moreover, "even if such a showing had been supported by the record, the fact that ex parte communication is merely cumulative would not make the consideration of such evidence harmless error" because "[e]x parte communications are presumed to have been in error." (Citation omitted.) Id.

Here, as in *Arnau*, there is no dispute as to the contents or relevance of the ex parte communication: co-defendant Taylor's prior counsel told the court, outside the presence of Hargis or his counsel, that Hargis might react violently to the knowledge that Taylor had recorded her conversations with him and with prosecutors. This information was not cumulative because none of the charges against Hargis involved crimes or threats of violence. Even if the information as to Hargis's dangerousness

14

had been cumulative, moreover, the State could not refute a presumption of harm when the trial court never disputed that it listened to the communication and that the account of it given at the hearing on the motion for new trial was accurate.

> When the court considers facts not properly in evidence, the other party has rights that can not be protected fully if he is thus denied the privilege of cross-examination. We know that citizens' rights and liberties are jeopardized when courts abandon the tried and proven court procedure of admitting only relevant evidence and producing witnesses who are subject to cross-examination.

*Arnau*, supra at 697 (1). Because "so fundamental a right" was denied Hargis as a result of Taylor's counsel's ex parte meeting with the judge, the trial court erred when it failed to recuse itself from the case, and, therefore, when it denied Hargis's motion for new trial. Accordingly, a new trial is necessary. Id. (ordering new trial on the basis of judge's reception of ex parte communication from witness); *Johnson v. State*, 278 Ga. 344, 346-348 (3) (602 SE2d 623) (2004) (judge's conduct, including ex parte communication with prosecutor during trial, resulted in an impression of bias, requiring reversal). We therefore reverse Hargis's conviction and remand for further proceedings consistent with this opinion.

15

3. Of Hargis's remaining assertions of error, the only issue we deem likely to recur on retrial is whether evidence seized from his truck and house in the wake of his July 2009 arrest was properly admitted. Hargis argues that because his arrest for obstruction occurred before police seized either his false identification in his wallet or the supplies in the bags also left in the truck, the search of his truck and house yielding these items was illegal. We agree.

(a) As the United States Supreme Court noted in *Arizona v. Gant*, 556 U. S. 332 (129 SC 1710, 173 LE2d 485) (2009), "circumstances unique to the vehicle context" justify a warrantless search incident to a lawful arrest "when it is reasonable to believe *evidence relevant to the crime of arrest* might be found in the vehicle." (Citation and punctuation omitted; emphasis supplied.) Id. at 343 (III) ("the *offense of arrest* will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein") (emphasis supplied). Id at 344 (III). "In many cases," however, "as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." (Citations omitted.) Id. at 343 (III). Thus the Court concluded that

> [p]olice may search a vehicle incident to a recent occupant's arrest *only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle*

16

*contains evidence of the offense of arrest*. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

Id. at 351 (VI) (emphasis supplied).

The Georgia Supreme Court recently applied *Gant* when it suppressed the results of a police search of a vehicle after its occupant had been arrested on an outstanding warrant. "'[B]ecause officers have many means of ensuring the safe arrest of vehicle occupants, it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains.'" *Boykins v. State*, 290 Ga. 71, 72 (2) (717 SE2d 474) (2011), quoting *Gant*, 556 U. S. at 343, n. 4. Specifically, and because "exceptions to the warrant requirement ensure [that] police may constitutionally search a vehicle when circumstances present genuine safety or evidentiary concerns *during the arrest* of a vehicle's recent occupant," our Supreme Court concluded that the trial court erred when it denied a motion to suppress the results of that vehicle search. (Punctuation omitted; emphasis supplied.) *Boykins*, supra at 73 (2).

17

The only issue raised and ruled on below was whether the seizure of Hargis's wallet and bags from the truck was authorized as incident to his arrest for obstruction.[6] When the officers in this case saw a man get into the driver's seat of the truck identified as Hargis's, they had sufficient justification to detain him for the purpose of determining whether he was the subject of the arrest warrant. See *State v. Williams*, 264 Ga. App. 199, 202-203 (590 SE2d 151) (2003) (reversing grant of motion to suppress where officer did not unnecessarily prolong traffic stop for purpose of determining whether defendant had an outstanding warrant against him). When Hargis refused to identify himself as either the subject of the warrant or the driver of the truck, police obtained probable cause to arrest him for obstruction. *Wynn v. State*, 236

---

[6] An inventory search on arrest can occur if it is "reasonably necessary under the circumstances." *Cappellan v. State*, 316 Ga. App. 467, 469 (729 SE2d 602) (2012) (reversing denial of motion to suppress drugs found in locked van carried on flatbed wrecker when record contained no evidence about department policy or procedures on inventory searches to support police testimony that it was found during such a search); see also *Duvall v. State*, 194 Ga. App. 420, 421 (390 SE2d 647) (1990) (police could reasonably impound a vehicle and conduct an inventory search when the vehicle would have otherwise remained unattended in the parking lot of a business). It is undisputed in this case, however, that neither officer seized the items from Hargis's truck as part of such an inventory search. Only after the officers had inspected the wallet found on the truck's front seat after Hargis's arrest, moreover, thus discovering the false identification often used to obtain methamphetamine supplies from area pharmacies, did they suspect that Hargis was again involved in methamphetamine manufacture.

18

Ga. App. 98, 100 (2) (511 SE2d 201) (1999) (a driver who gave a false name when seated behind the wheel of a parked car provided evidence sufficient to prove obstruction); *Hall v. State*, 201 Ga. App. 328, 328-329 (1) (411 SE2d 274) (1991) (defendant driver's refusal to provide identification to the officer was sufficient evidence that she hindered the execution of an officer's duties); *Coney v. State*, 316 Ga. App. 303, 307-308 (3) (a), (b) (728 SE2d 899) (2012) (even where information that defendant has an outstanding warrant is in error, police reasonably relying on that information were authorized to arrest defendant and search his person incident to that arrest).

Hargis had already been removed from the car and handcuffed before the police search of his vehicle began, however, with the result that police cannot show that their safety required a search of the truck's passenger compartment during the arrest. See *Boykins*, supra, 290 Ga. at 72 (2) (noting the lack of evidence as to defendant's physical location "in relation to the vehicle at the time of the search"). Because Hargis's "offense of arrest" was obstruction of police's efforts to identify him as the subject of the arrest warrant, moreover, we cannot say that the officers acted lawfully when they seized and examined the wallet and bags remaining in the truck after Hargis was handcuffed. See *Canino v. State*, 314 Ga. App. 633, 639-641 (2), (3) (725 SE2d

19

782) (2012) (reversing denial of motion to suppress when the police searched defendant's car "immediately after" defendant was placed under arrest and when the State failed to show either that the defendant was "unsecured at the time the search began" or that the impoundment of his vehicle was reasonably necessary); *Holsey v. State*, 306 Ga. App. 75, 76-77 (1) (701 SE2d 538) (2010) (results of warrantless search of vehicle following arrest for loitering were properly suppressed when defendant was not within reach of vehicle and there was no likelihood that evidence of loitering would be found inside). Compare *Hawkins v. State*, 307 Ga. App. 253, 256-257 (1) (704 SE2d 886) (2010) (affirming denial of motion to suppress when police reasonably believed that text messages proving defendant's involvement in drug deal would be found in the cell phone remaining in her car after her arrest), aff'd, 290 Ga. 785 (723 SE2d 924) (2012). When Hargis refused to provide identification and was arrested, police could not reasonably have believed that further evidence relevant to the "offense of arrest" – that is, his obstruction of police efforts to identify him – could be found in the truck. It follows that the State has presented no evidence of "genuine safety or evidentiary concerns" sufficient to justify a warrantless search in the immediate aftermath of that arrest. *Boykins*, supra at 73 (2) (reversing denial of motion to suppress when the State "failed to meet its burden of proving the search

20

incident to arrest exception to the warrant requirement"). We therefore conclude that the police's search of his truck was unlawful and that the trial court erred when it denied Hargis's motion to suppress the results of the search.

(b) Because we reverse the trial court's denial of Hargis's motion to suppress evidence of the wallet and bags recovered from his truck moments after his July 2009 arrest for obstruction, we also direct the trial court to suppress the evidence recovered from his house pursuant to the search warrant obtained on the basis of these illegally seized items as "fruit of the poisonous tree." (Citation and punctuation omitted.) See *State v. Driggers*, 306 Ga. App. 849, 852-853 (3) (702 SE2d 925) (2010) (suppressing evidence obtained "as a direct result" of officers' illegal presence in defendant's living room). Compare *Teal v. State*, 282 Ga. 319, 326-327 (2) (647 SE2d 15) (2007) (where a search warrant issued after an investigator's illegal entry was based on information gathered before that illegal entry, the evidentiary results of the warrant were admissible under the inevitable discovery exception); *Lawson v. State*, 299 Ga. App. 865, 869-870 (1), (2) (684 SE2d 1) (2009) (where defendant's attack on police at his home dissipated any taint of illegality arising from officer's arguably wrongful intrusion, a protective sweep as well as the seizure of evidence pursuant to a resulting search warrant were legal).

(c) In light of this disposition, which does not affect the evidentiary basis of the 2006 charges at issue in this appeal, we need not decide whether the July 2009 evidence would be admissible as a similar transaction in a new trial on those 2006 charges. We also note that no issue has been presented to us concerning the admissibility of Hargis's 1997 Arizona conviction for attempted possession of methamphetamine manufacturing equipment.

*Judgment reversed and case remanded with direction. Miller, P. J., and Ray, J., concur.*